UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------

**MIKE WHITE,**

    Plaintiff

--against--

**ERIC GUTWEIN,** Special Hearing Officer, Green Haven Correctional Facility, **DONALD VENETOZZI,** Director of Special Housing/Disciplinary Program at Green Haven Correctional Facility, **THOMAS GRIFFIN,** Superintendant of Green Haven Correctional Facility, **NYS Dept of Corrections and Community Supervision, John Doe 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,** Correctional officers at Green Haven Correctional Facility, **Lieutenant Deagan,** Green Haven Correctional Facility

    Defendants

AMENDED COMPLAINT

20-cv-04532

-------------------------------------------------

Brief Memorandum on the Statute of Limitations

    The statute of limitations for causes of action brought under 42 USC 1983 is 3 years. In this case, this time is tolled by the exhaustion process and by executive order 202.8.

    Claims brought by a prisoner are entitled to equitable tolling during the time period the prisoner is exhausting his administrative remedies. *Gonzalez v. Hasty*, 651 F.3d 318, 319 (2d Cir. 2011). This tolling applies to the time when the prisoner is "actively exhausting" their claims, not during the period in between the accrual of the claims and when the administrative remedy process is begun. *Id, Citing Brown v Valoff,* 209 F.3d at 596 (9th Cir 2005).

    Any claim brought in the Southern District of New York whose statute of limitations accrues during the period from March 20, 2020 to November 3, 2020 is also entitled to tolling pursuant to executive order 202.8. *Paul v. Capra*, 20-cv-5154(NSR), 12 (S.D.N.Y. Mar. 31, 2022).

    In this case Plaintiff's complaint was submitted on June 5, 2020. Plaintiff is entitled to tolling from March 20, 2020 to June 5, 2020, or 77 days. Plaintiff is also entitled to tolling from the time when his grievances were filed to the time he received a final disposition on his grievances. Due to Plaintiff's poor eyesight and due to the destruction of Plaintiff's records by Officers at Green Haven Correctional Facility, Plaintiff does not have records of when his grievances were filed regarding these incidents.

However, given that the first incident alleged occurred on March 10, 2017, Plaintiff need only have been "actively exhausting" his administrative remedies for a total of ten days in order for all of his claims to be within the statute of limitations. Plaintiff asks that the court proceed under the assumption that the exhaustion process took at least 10 days, and thus that all of Plaintiff's claims are within the statute of limitations, unless the Defense can show otherwise.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**MIKE WHITE,**

    Plaintiff

--against--

**ERIC GUTWEIN,** Special Hearing Officer, Green Haven Correctional Facility, **DONALD VENETOZZI,** Director of Special Housing/Disciplinary Program at Green Haven Correctional Facility, **THOMAS GRIFFIN,** Superintendant of Green Haven Correctional Facility, **NYS Dept of Corrections and Community Supervision, John Doe 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,** Correctional officers at Green Haven Correctional Facility, **Lieutenant Deagan,** Green Haven Correctional Facility

    Defendants

AMENDED COMPLAINT

20-cv-04532

---

## AMENDED COMPLAINT[1] [2]

### I. INTRODUCTION

1. Plaintiff in the above-caption action allege(s) as follows
2. Plaintiff brings this action seeking damages pursuant to 42 USC §1983, against the New York State Department of Corrections and Community Supervision (hereinafter DOCCS) employees, executive and administrative staff, Correctional Officers and Correctional Supervisors at Green Haven Correctional Facility in their individual and official capacities.
3. The court has jurisdiction over this action pursuant to 28 USC §§ 1331, 1341(a)(3), 1341(a)(4), a1367(a) and 42 USC §1983
4. Venue is proper in this District pursuant to 28 USC §1391

---

[1] This document was prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the Southern District of New York.

[2] Plaintiff and the Clinic apologize for any delay in submission. The Clinic misjudged mailing times and was hampered by month-long scheduling lag at Green Haven Correctional Facility. Plaintiff consents to any corresponding extension for Defendants.

## II. **PARTIES**

5. Plaintiff and was at all times relevant a herein a permanent resident of the United States and resides at:

Mike White
DIN No. 10A0948
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

6. Defendants are as follows, sued in their individual and official capacity: [Include Names and Addresses, Employer, and Job Title. Each of these Defendants needs to have an explanation of what they did wrong in the Statement of Claim. If you do not know someone's name, you can put them as "John Doe 1 or Jane Doe 1, John Doe 2, etc.]

**ERIC GUTWEIN**
Special Hearing Officer
Green Haven Correctional Facility

**DONALD VENETOZZI**
Director of Special Housing/Disciplinary Program
Green Haven Correctional Facility

**THOMAS GRIFFIN**
Superintendent of Green Haven Correctional Facility

**NYS Dept of Corrections and Community Supervision**

**John Doe 1,** Who dragged Plaintiff to SHU

**Jane Doe 2,** Who dragged Plaintiff to SHU

**John Doe 3,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 4,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 5,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 6,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 7,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 8,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 9,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**John Doe 10,** Who failed to intervene when Plaintiff was attacked in the SHU, Failed to recognized the clear danger to Plaintiff in sending him to recreation with Prisoner A, Failed to Accommodate Plaintiff's Religious Needs, Failed to Fix the Dangerous and Inhumane Conditions of Confinement

**Lieutenant Deagan**
Green Haven Correctional Facility

### III.  EXHAUSITON OF ADMINISTRATIVE REMEDIES

7. There is a grievance procedure at Green Haven Correctional Facility
8. All grievances in relation to the matters alleged herein were filed, appealed and exhausted.

### IV.  STATEMENT OF CLAIM

9. Mike White ("Plaintiff") was a prisoner housed at Green Haven Correctional Facility in Stormville New York in the custody of the New York Department of Corrections and Community Supervision from 2014 until the present.
10. Generally Plaintiff met with his counselor in Building 12.
11. On Friday March 10th, 2017, Plaintiff received a callout to see his counselor that read to go to Building 2. However Plaintiff did not read the callout slip, assuming that he needed to go to Building 12, as he had done the 4-5 previous times he had met with her. Plaintiff went with a group of other prisoners to receive services in Building 12 on or around 9am. However when Plaintiff got to Building 12 he got there he found that his counselor was not there. Building 12 is

a centrally located building at Green Haven Correctional Facility. There was no illicit motivation for Plaintiff to be in Building 12. Plaintiff waited around for his counselor to show up, but his counselor never showed up.
12. On or around 10:30am of that same day, Building 12 programming let out. The bell rang in Building 12, indicating that it was time for plaintiff to go back to his housing area.
13. Plaintiff's counselor's office was located at Transitional Services in Building 12 on the second floor at the back of the building. When Plaintiff heard the bell, he navigated his way towards the exit of Building 12. However, on the way out, Plaintiff encountered Correctional Officer S. Reeves.
14. CO Reeves asked Plaintiff his name, and Plaintiff replied with his name. The officer asked Plaintiff to come with him, and then asked Plaintiff to walk in front of him.
15. Plaintiff was then escorted from Building 12 into a corridor outside of the building by CO S. Reeves.
16. Upon entering this corridor, Plaintiff saw that there were multiple dozens of correctional officer lined up against the wall facing the open corridor. Plaintiff noticed that among them were two lieutenants, signified by grey pants and white shirts, as opposed to the normal CO dress of blue pants and blue shirts.
17. As Plaintiff passed in front of these officers he heard multiple voices yell at him to "get on the wall". Plaintiff complied, put his hands on the wall, and spread his feet, as he was instructed to do by one or more of the officers. Plaintiff put against the wall frisked, and handcuffed. Lt. Deagan ordered that Plaintiff be taken to the SHU.
18. John Doe COs 1 and 2 grabbed Plaintiff, spun him around and started walking with Plaintiff. After a few steps, these officers grabbed Plaintiff under his arms and dragged plaintiff in the direction of the SHU.
19. On the way to the SHU from the corridor where Plaintiff was apprehended, there are 5 gates which anyone who wishes to traverse the prison must pass through.
20. After the first gate, Lt. Deagan told the John Doe Officers "You all are missing your opportunity." Plaintiff took this to mean the "opportunity" to hurt Plaintiff.
21. When Plaintiff and his escorts reached the second gate, the officers smashed Plaintiff's shoulder into the gate as he was waiting for it to open. When the gate opened wide enough for the officer on Plaintiffs left hand side to get through, that officer walked through and pulled Plaintiff hard, slamming Plaintiffs shoulder into the gate, which was still in the process of opening. Plaintiff felt his shoulder throbbing.
22. Plaintiff's escorts continued to drag Plaintiff until he reached the second gate.
23. At the next gate, John Doe Officers 1 and 2 attempted to slam Plaintiff into the gate once, however, Plaintiff turned in order to avoid being slammed and took a glancing blow instead.
24. Plaintiff's escorts continued to drag Plaintiff, going through the 4th gate without incident.
25. After the 4th gate Plaintiff was still being dragged by officers 1 and 2.
26. When Plaintiff was taken left into the corridor that leads into the SHU, Joe Does Officers 1 and 2 began to walk more quickly, hurrying Plaintiff toward the SHU. In this rush, Plaintiff's glasses fell off, which severely restricted Plaintiff's vision. Plaintiff cried out "my glasses, my glasses!" One of the John Doe officers said "You don't have to worry about those!" Plaintiff then heard, behind him, a forceful step on the ground and heard a crunching noise. Plaintiff understood that his

glasses had been intentionally broken by John Doe Officer 1 or in the alternative, John Doe Officer 2.
27. Plaintiff was then taken into the elevator up to the SHU area, and was taken out of the elevator and taken to the right.
28. Plaintiff was turned over to other officers in charge of the SHU area. These officers uncuffed Plaintiff, and strip searched him and found that Plaintiff had no contraband.
29. These officers then gave Plaintiff special SHU clothes and assigned Plaintiff to a cell.
30. Plaintiff was then put in a cell in the SHU, the 3rd or the 4th cell to the right as he got out the elevator. The Sergeant in the SHU at the time, whose name begins with M, then asked Plaintiff what he was doing in building 12. Plaintiff responded that he hadn't read the whole callout slip and that he was simply going from to building 12 because that's where his counselor normally was.
31. Plaintiff was then given a disciplinary report. The report alleged that Plaintiff was out of place in an unassigned area, among other charges.
32. Plaintiff was given notification of a disciplinary hearing that he needed to attend. When Plaintiff was given notice, Plaintiff checked a box on a piece of paper indicating that he wanted assistance with his defense at his hearing. Plaintiff was assigned an assistant. On information and belief this assistant was Mancuso, an employee in the Green Haven Psych Department, not Story as Plaintiff previously alleged.
33. A few days after Plaintiff's March 10th apprehension, Plaintiff asked Mancuso to gather documentary evidence, including old callouts for Plaintiff to see his counselor in Building 12. Plaintiff hoped these documents would demonstrate that Plaintiff's going to building 12 was an honest mistake.
34. Plaintiff also asked Mancuso to get a statement from a worker who works in transitional services, stating that he always comes to transitional services in Buidling 12 to see his counselor.
35. Mancuso later told Plaintiff that she had the documents that Plaintiff requested, however, she could not give those documents to Plaintiff because she had been told by Defendant Special Hearing Officer Gutwein not to give Plaintiff any documents or witness statements.
36. Mancuso asked Plaintiff to sign a release saying that Mancuso had satisfactorily performed her duties as his hearing assistant, but Plaintiff refused to sign because Mancuso had refused to give Plaintiff the documents he needed.
37. Before getting a hearing, Plaintiff's hearing was delayed 2 or 3 times, during this period, Plaintiff was held in the SHU without being found guilty of any disciplinary charges.
38. Plaintiff's hearing was held from May 11, 2017 – May 19, 2017. At this hearing Plaintiff was unable to present documents and was denied the ability to present witness testimony.
39. Gutwein held a hearing and refused to allow documents to be entered into evidence that showed Plaintiff had regularly seen his counselor in Building 12. He also barred a prisoner witness from testifying about Plaintiff's honest motivations in going to Building 12.
40. Plaintiff was sentenced to 150 days in SHU, 150 day loss of telephone use, loss packages, commissary, and 150 days loss of good time, which falls outside of DOCCS Sentencing guidelines for Plaintiff's offense.
41. Plaintiff had previously appealed a sentence handed down by Gutwein and won. Plaintiff believes that Gutwein gave Plaintiff a disproportionate sentence to demonstrate his authority to Plaintiff.

42. On information and belief Defendant Gutwein has a history of handing down sentences outside of DOCCS sentencing guidelines.
43. Plaintiff asked why the sentence was so severe. Defendant Gutwein did not answer the question and simply handed down the sentence.
44. Plaintiff appealed the determination to Director Vinitoldi in Albany, who affirmed the charges in or about 2 months.
45. After receiving the determination from Albany Plaintiff filed an article 78 in Duchess County Supreme Court. The case was heard by Judge Posner, and the judge granted Plaintiff's unopposed motion to expunge the disciplinary records. However, at this point, Plaintiff had already served the majority of his SHU sentence. Prior to the granting of the article 78 Plaintiff had already suffered an atypical and significant hardship.
46. Plaintiffs SHU sentence began on Friday, March 10th, 2017.
47. When Plaintiff was transferred to the SHU, he immediately noticed that he was being held in between two prisoners with extreme mental health issues.
48. On information and belief one of these prisoners (SHU Prisoner A) was moved in the cells next to Plaintiff's for fighting on the other gallery, and for throwing feces at SHU correctional officers.
49. When Plaintiff got to the SHU, Prisoner A had a plastic shield near the roof of his cell, adjacent to Plaintiff's cell. Plaintiff understood that these shields were usually put in place when a prisoner would throw objects, especially feces, at officers and/or other prisoners. Any officer working the SHU would have been aware that Prisoner A had mental illness or otherwise was inclined to throw feces and act in a volatile manner.
50. While Plaintiff was on the SHU, one or several of John Doe Officers 4-10 removed the plastic shield from Prisoner A's cell. After this Prisoner A began to throw feces at officers and at Plaintiff. So one or several of John Do Officers 4-10 replaced the plastic shield.
51. While on the SHU, Plaintiff frequently heard Prisoner A boasting about all of the people that he had beaten up, how tough he was, and how he loved fighting. This boasting was constant and would have been heard by John Doe Officers 4-10, either from being present in the gallery, or in the bubble, where they would have heard Prisoner A through the microphones in SHU.
52. On or about 2-3 weeks after Plaintiff was put in the SHU Plaintiff observed SHU Prisoner A attack another prisoner in the SHU at recreation. SHU Prisoner A repeatedly punched the other prisoner, until the other prisoner's face was badly swollen. That prisoner was transferred into a different tank.
53. Guys in first tank told me the incident they were going through before I got
54. While Plaintiff was in the SHU, he observed one of his prisoner neighbors get in a fight in the tank with someone else who was being held in SHU.
55. The SHU cell was roughly 8' (door to back) by 5', with a bed consisting of a metal slab with a grey and black covered cotton mattress, a blanket and a pillow. In the cell there was also a toilet and a sink.
56. In Plaintiff's SHU cell there was a broken window. For the entirety of the time that Plaintiff was held in the SHU this window was not fixed. Because of this Plaintiff was exposed to freezing winter temperatures for the extent of his stay in the SHU.
57. The night Plaintiff was put in SHU Plaintiff asked Officers John Doe 4 and John Doe 5 who worked in the gallery to cover the hole in his window with blankets, cardboard, anything to keep the cold air from rushing in. Officers refused his requests. For about 10 days Plaintiff asked John

Doe Officers 4, 5, 6, 7, and 8 who were working on the gallery every day for something to do be done about the hole in his window. However the officers refused to respond. After 10 days, Plaintiff stopped asking because he understood that nobody was going to help him.
58. Plaintiff had a 2 sheets and a light blanket to cover himself and had to endure freezing cold temperatures.
59. According to the wundground.com archives, on March 10, 2017 the high temperature in Stormville, NY was 41 degrees Fahrenheit, the low was 18 degrees.
60. On March 11, 2017 the high temperature in Stormville, NY was 23 degrees Fahrenheit, the low was 10 degrees.
61. On March 12, 2017 the high temperature in Stormville, NY was 25 degrees Fahrenheit, the low was 14 degrees.
62. On March 13, 2017 the high temperature in Stormville, NY was 32 degrees Fahrenheit, the low was 10 degrees.
63. On March 14, 2017 the high temperature in Stormville, NY was 27 degrees Fahrenheit, the low was 19 degrees.
64. Plaintiff was forced to endure freezing cold temperatures, which John Doe Gallery Officers failed to remedy, either by fixing the hole in Plaintiff's window, or by offering Plaintiff more blankets or other ways to keep warm.
65. Plaintiff is of the Muslim Faith.
66. In 2017 Ramadan began on May 27th and ended at dusk on June 24$^{th.}$
67. Before Ramadan began, Plaintiff told one of officers John Doe 4, 5, 6, 7, 8, 9, or 10 that he needed special food accommodations for Ramadan because he was Muslim. The responding Officer told Plaintiff that "we don't know nothing about that."
68. During this time Plaintiff would be served at normal dinner time on or about 4:30pm. However, this was well before dusk and so in order to faithfully observe Ramadan Plaintiff had to keep his food in his cell during this time. In the hours between being served and dusk, the vermin in and around Plaintiff's cell would come and try to eat Plaintiffs food. For a week Plaintiff spent hours fending off cockroaches and mice who were attempting to eat his food. When Plaintiff told officers about his situation and asked for accommodations they told him he was "on [his] own."
69. Plaintiff continued to tell one or multiple of Officers John Doe 4, 5, 6, 7, 8, 9, 10 who worked on the SHU gallery that he needed special accommodations for Ramadan, however, Plaintiff did not receive those accommodations for a week.
70. Plaintiff told a prisoner who was leaving the SHU that he needed to receive religious accommodations for Ramadan. After this, Plaintiff began receiving his food for Ramadan.
71. However, Plaintiff would receive his food at 9-9:30pm, at which time it had grown cold. Sometimes Plaintiff would be served meals without chicken or fish, which Plaintiff understood meant that the meal had been tampered with, altered, or partially taken from him.
72. For the entirety of Ramadan Plaintiff was deprived of group prayer which is a sacred part of breaking fast.
73. On 5 to 6 separate occasions, Plaintiff's neighbors flooded the SHU by stuffing towels in the toilets and continuously flushing them. Sewage water flooded Plaintiff's cell and the cells surrounding them. Each and every Officers who was on duty in the SHU, including John Does 4-10 were aware of these acts, seeing the flooding when they walked by, and observing it on audio and video from the "bubble" which monitors the SHU.

74. Whenever Plaintiff's cell was flooded with sewage in this way, Plaintiff would wait all day for Officers and SHU porters to come clean the filth, which would usually occur around 7pm. This meant that Plaintiff spent 5-6 days living in water tainted by urine and feces.
75. On a date during Plaintiff's SHU sentence, Plaintiff went out with the other prisoners in his tank for recreation, including Prisoner A. Plaintiff was restrained on the way to the open air room on the roof, which constituted the SHU recreation room. When Plaintiff and other prisoners got to the roof, one of officers John Doe 4-10 removed restraints, frisked prisoners and then let them through the doors onto the roof for unrestrained recreation time. Officers did not come onto the roof. One officer stayed in between the two doors that lead to the roof, where the "pin" to alert other officers of danger or conflict, was located.
76. Officers Doe knew based on Prisoner A's history of fighting, placement on the SHU, and aggressiveness towards officers and other prisoners while locked up, that Prisoner posed a serious danger to any prisoner during unrestrained recreation time.
77. Suddenly, without warning or provocation, Prisoner A rushed Plaintiff, tripped him, and started banging his head on the ground. One of the John Doe Officers started yelling "stop fighting" at the window, but did not intervene. Plaintiff lost consciousness, then came back into consciousness with his head still being slammed against the floor. Then Plaintiff lost consciousness again. Plaintiff came back into consciousness when another prisoner pulled Prisoner A off of Plaintiff. When Plaintiff was trying to get back up the other prisoner lost control of Prisoner A, who again rushed Plaintiff. As Prisoner redoubled his assault on Plaintiff, one or more officers ran out and restrained Prisoner A. Officers yelled at Plaintiff to on the walls as his head was still spinning, then searched and handcuff Plaintiff and took Plaintiff back inside.
78. Plaintiff remembers seeing a Nurse for his head trauma, who gave him ice. The nurse asked Plaintiff a few questions that Plaintiff does not remember because the world was foggy to him at the time. Plaintiff vaguely recalls discussion of a concussion. Plaintiff received a ticket for fighting which was later dismissed.
79. Plaintiff now lives with extreme PTSD, and emotional trauma, as well as lingering effects of his traumatic head injury. Plaintiff lives in fear. Being around people makes him anxious when it never had before. Plaintiff is always watching his back and has his back against the wall whenever he can. Plaintiff is suspicious other every movement, and everything he sees out of the corner of him eyes makes him anxious. Whenever Plaintiff hears loud banging or clanging sounds, which are common in prison, he is brought back to painful memories of his assault. Because of his trauma, Plaintiff struggles to sleep at night. The slightest noise, even of a toilet flushing wakes him in a heightened state of excitement and alarm. Plaintiff sees visions of Prisoner A in his sleep and wakes up full of fear and anxiety. Plaintiff continues to suffer from migraines resulting from the head trauma that he experienced.

## V. **RELIEF**

80. Plaintiff demands **A TRIAL BY JURY**
81. Plaintiff asks for the following relief
a.  $1 million in Compensatory Damages
b.  $1 million in Punitive Damages

I, Mike White, declare under the penalty of perjury that the foregoing is true and correct.

Date: 12/28/23

Respectfully submitted

_____

Plaintiff Pro Se

